BRIAN B., et al.

v.

## COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF EDUCATION, et al.

### No. Civ.A. 96–7991.

United States District Court, E.D. Pennsylvania.

June 18, 1999.

612

Marsha L. Levick, Laval S. Miller-Wilson, Philadelphia, PA, Alyssa R. Fieo, Philadelphia, PA, for Brian B., by and through his mother, Lois B., Abdul R., by and through his mother, Dena R., Byron A., by and through his mother, Carrie W., Ronelle W., by and through his mother, Pamela J., Steven S., by and through his guardian, Nancy F., Jeremiah M., by and through his mother, Susan M., Anthony T., by and through his mother, Christine H., Kenneth R., by and through his mother, Nancy R., Plaintiffs.

Michael L. Harvey, Office of Attorney General, Harrisburg, PA, for Commonwealth of Pennsylvania Department of Education, Eugene Hickok, Defendants.

Natalie M. Habert, Beatty, Young, Otis and Lincke, Media, PA, for Garnet Valley School District, Defendant.

Robert T. Lear, Philadelphia, PA, for Philadelphia School District, Defendant.

Michael I. Levin, Michael I. Levin And Associates, P.C., Huntingdn Valley, PA, for Central York School District, Defendant.

## OPINION

POLLAK, District Judge.

A Pennsylvania statute enacted in 1997, 24 P.S.A. § 13–1306.2(a), authorizes Pennsylvania school districts to withhold education from persons of school age who are incarcerated in county correctional institutions following conviction as adults. The statute states that "[a] person under twen-

ty-one (21) years of age who is confined to an adult local correctional institution following conviction for a criminal offense who is otherwise eligible for educational services as provided under this act shall be eligible to receive educational services from the board of school directors in the same manner and to the same extent as a student who has been expelled...." Since students who have been "expelled" are only entitled to very meager "educational services," if any, the effect of this statute is to authorize the withholding of all or virtually all education from persons of school age who are incarcerated, pursuant to conviction, in county correctional institutions—as distinct from persons of school age who are incarcerated, pursuant to conviction, in state correctional institutions or who are confined, pursuant to adjudication of delinquency, in juvenile detention facilities; state correctional institution inmates of school age and juvenile detention facility inmates of school age must be provided the same education guaranteed to all other Pennsylvania residents of school age. In their motion for a preliminary injunction restraining the enforcement of 24 P.S.A. § 13–1306.2(a), plaintiffs claim that the statute's disparate treatment of those whom they view as similarly situated groups of inmates violates the equal protection clause. The extensive record developed by the parties on the motion for a

preliminary injunction lends strong support to plaintiffs' contention that withholding education from any category of inmates of school age, pursuant to 24 P.S.A. § 13–1306.2(a), is a policy freighted with gravely detrimental social consequences. Nonetheless, I am not persuaded that there is a reasonable probability that at a final hearing on the merits I would conclude that this barely-arguably-penny-wise but almost-indisputably-pound-foolish statute is unconstitutional. Accordingly, I must deny the motion for a preliminary injunction.

## I. Facts and Procedural History

Plaintiffs are a class[1] of persons under the age of twenty-one presently confined in so-called "local [i.e., county] correctional institution[s]."[2] In December of 1996, Brian B. and five other young men brought this action against the Pennsylvania Department of Education, Department of Education Secretary Eugene Hickok ["Secretary Hickok" or "the Secretary"], and the school districts in which Delaware County Prison, Philadelphia House of Corrections, and York County Prison are located, alleging "violations of their rights to basic and special education as guaranteed them by the United States Constitution, federal statutes and state law." Amended Compl. at 1–2.[3]

1. On December 23, 1996, plaintiffs filed a motion for class certification pursuant to Fed. R.Civ.P. 23(b)(2) seeking to represent "all school-aged detainees, either awaiting trial or convicted, who were, or will be in the future, entitled to basic and special education services under state and federal law, but were being denied such education either in part or absolutely." Plaintiffs' Post-trial Br. at 2–3. The motion was granted at the preliminary injunction hearing. See 11/25/97 Tr. at 167. In the interim between the filing of the class certification motion and the preliminary injunction hearing, the parties provisionally settled issues related to school-aged pretrial detainees and those convicted offenders entitled to special education. See Interim Agreement.

2. 24 P.S.A. § 13–1306.2(e) defines a "local correctional institution" as "any jail, prison or detention facility operated by a county or

by a municipality. The term does not include any facility used for the detention or confinement of juveniles." Defendant Secretary of Education Eugene Hickok and the plaintiffs often speak of "county" (rather than "local") institutions when discussing the constitutionality of the statute, perhaps because 42 P.S.A. § 9762, which governs places of confinement, refers to "county" but not "local" institutions. Though the scope of 24 P.S.A. § 13–1306.2 appears wider than 24 P.S.A. § 9762—encompassing, for instance, municipal jails—the evidence adduced and arguments presented in this court have uniformly referred to "county" correctional institutions.

3. In the original complaint, plaintiffs alleged violations of the Individuals with Disabilities Education Act ["IDEA"], 20 U.S.C. § 1400 et seq.; IDEA implementing regulations; Section 504 of the Rehabilitation Act of 1973

The Pennsylvania Public School Code requires school districts to provide free educational services to persons under the age of twenty-one residing within their boundaries.[4] When plaintiffs filed their original complaint, the Pennsylvania Public School Code generally required that, at the high school level, this education consist of five and a half hours of instruction per day—27.5 hours per week—for 180 days per year. No distinction was made between incarcerated and unincarcerated persons. 24 P.S.A. §§ 13–1306, 13–1306.2. Though the Public School Code did not distinguish between incarcerated and unincarcerated persons, practice did. Education was generally not provided to persons under the age of twenty-one incarcerated in county correctional institutions, though it was provided to persons of the same age incarcerated in state correctional institutions or held in juvenile facilities. After plaintiffs initiated this action challenging that practice, the Pennsylvania legislature amended the Public School Code to codify the practice. The pertinent Code provision—Section 13–1306.2(a)—now reads in relevant part:

> (a) A person under twenty-one (21) years of age who is confined to an adult local correctional institution following conviction for a criminal offense who is otherwise eligible for educational services as provided under this act shall be eligible to receive educational services from the board of school directors in the same manner and to the same extent as a student who has been expelled pursuant to section 1318.

24 P.S.A. § 13–1306.2(a). Expelled students under the age of seventeen are entitled to "some [educational] provision," 22 Pa.Code § 12.6—but "some" has been construed to be a minimal guarantee. *See Abremski v. Southeastern Sch. Dist. Bd. of Directors*, 54 Pa.Cmwlth. 292, 421 A.2d 485, 488 (1980). Expelled students who have reached their seventeenth birthday are not entitled to any education. 22 Pa. Code § 12.6. Thus, the effect of 24 P.S.A. § 13–1306.2(a) is to substantially curtail, or wholly eliminate, the educational entitlement of convicted county correctional institution inmates under the age of twenty-one.

In November of 1997—nearly a year after the initiation of this litigation—plaintiffs entered into an Interim Agreement with the Pennsylvania Department of Education and Secretary Hickok [the "Commonwealth defendants"], after which plaintiffs and the Commonwealth defendants jointly requested that this court hold in abeyance all motions pending against the Commonwealth defendants with the exception of plaintiffs' "claims against Secretary Hickok challenging the constitutionality of 24 P.S.A. § [13–]1306.2(a) under the Equal Protection Clause of the Fourteenth Amendment and Plaintiffs' request that the Court enjoin the enforcement of 24 P.S.A. § [13–]1306.2(a)." Interim Agreement ¶ 10. An order to this effect was entered on November 24, 1997. The sole question now before this court is whether plaintiffs are entitled to a preliminary injunction pending a full trial determining whether 24 P.S.A. § 13–1306.2(a) violates the equal protection clause.

Because questions of justiciability have been raised, it may be useful to review

---

["RA"], 29 U.S.C. § 794; RA implementing regulations; due process and equal protection guaranteed by the Fourteenth Amendment of the United States Constitution; and supplemental state claims sounding in the Pennsylvania Public School Code, 24 P.S.A. §§ 1–101 et seq. Subsequent to the filing of the original complaint, the IDEA and Pennsylvania Public School Code were amended; plaintiffs filed an amended complaint addressing the amendments.

4. Persons who have reached their sixth birthday but have neither reached their twenty-first birthday nor graduated from high school are entitled to a free education. 24 P.S.A. § 5–501; 24 P.S.A. § 13–1301. Persons who have reached their eighth birthday but have neither reached their seventeenth birthday nor graduated from high school are required to attend school. 24 P.S.A. §§ 13–1326, 13–1327.

events leading up to the preliminary injunction hearing. Plaintiffs filed their motion for a preliminary injunction on May 21, 1997. Over the next two months, each school district filed a separate response, and the Commonwealth defendants filed a joint response. On August 26, 1997, plaintiffs filed an amended complaint; shortly thereafter, the Commonwealth defendants filed a motion to dismiss, as did each of the three school districts. On November 10, 1997, the plaintiffs and the Commonwealth defendants executed the Interim Agreement referred to in the previous paragraph. The Interim Agreement provisionally resolved all claims related to special education and to the basic education of pretrial detainees. Prior to the scheduled hearing on the motion for a preliminary injunction, the plaintiffs and the Commonwealth defendants—but not the individual school districts—filed pre-trial briefs.

A telephone conference was held on November 21, 1997, during which this court discussed, with all parties, procedural matters related to the upcoming preliminary injunction hearing. In this telephone conference, the local school districts expressed their willingness to rest on the Commonwealth defendants' defense of § 13–1306.2(a), and it was decided that the school districts' presence at the preliminary injunction hearing was not essential, though they were welcome to attend. The preliminary injunction hearing began on November 24, 1997, with counsel for the plaintiffs, the Commonwealth defendants, and the Central York School District present. The plaintiffs and the Commonwealth defendants submitted a joint stipulation to over a hundred facts, as well as a series of stipulated documents. None of the individual school districts contested the accuracy or authenticity of any of the information or documents set forth in the stipulations. On the first day of the hearing, the Commonwealth defendants argued—as they had not in their motion to dismiss plaintiffs' amended complaint—that there was no case or controversy between the plaintiffs and them. *See* 11/24/97 Tr. at 36–57.

The next day, at the close of plaintiffs' case-in-chief, the Commonwealth defendants resumed their argument that the case was not justiciable with respect to them. I did not rule on the issue at that time, and instead invited counsel for the Philadelphia School District and Garnet Valley School District to join the proceedings. Because the school districts remained parties to the action and there was a possibility that the Commonwealth defendants would be determined not to be proper defendants, I informed the school districts that, should the Commonwealth defendants prevail on their claim of nonjusticiability and hence be dismissed as defendants, the school districts would be entitled to cross-examine plaintiffs' witnesses and present any case-in-chief that they wished to present. *See* 11/25/97 Tr. at 169–71.[5] Near the end of that discussion, plaintiffs conceded that, pursuant to the Eleventh Amendment, the Pennsylvania Department of Education (PDE) was not a proper defendant, leaving Secretary Hickok the sole defendant as to plaintiffs' claims for injunctive and declaratory relief with respect to state authorities.[6]

---

5. Central York School District twice stated that it adopted the substantive defense of Secretary Hickok. *See* 11/25/97 Tr. at 51–52; Central York School District's Reply Mem. of Law in Opp. to Pl. Mot. for Prelim. Inj. at 2. The Philadelphia School District did not express any desire to mount a separate constitutional defense, and noted that it sought "guidance and closure," rather than the opportunity to mount further defenses. *See* 11/25/97 Tr. at 154–55. Garnet Valley School District expressed no opinion on the matter.

6. Accordingly, this opinion refers to "the Commonwealth defendants" up to the point—late in the second day of the preliminary injunction hearing—at which the plaintiffs conceded the PDE's immunity; it refers to "Secretary Hickok"—rather than "the Commonwealth defendants"—after the concession, since the PDE was no longer a proper defendant.

In all, the preliminary injunction hearing took two days, during which four witnesses testified and dozens of exhibits were introduced. Following preparation of a transcript of the hearing, the plaintiffs and two of the defendants—Central York School District and Secretary Hickok—submitted post-trial memoranda. At my request, the plaintiffs and Secretary Hickok prepared a supplemental set of fact stipulations, related to the legislative history of § 13–1306.2 and to Pennsylvania law and practice regarding commitment to and transfer between county and state prisons. Those supplemental stipulations were filed on February 19, 1998. I address the motion for preliminary injunction in light of the entire evidentiary record.

## A.

In Pennsylvania, persons who have not yet reached their twenty-first birthday ("school-aged persons") can be tried as alleged delinquents by a juvenile court or tried as alleged adult criminals in a criminal court. Under Pennsylvania law, the juvenile court generally has jurisdiction over a "child" accused of criminal offenses.

The Pennsylvania Juvenile Act defines "child" as a person:

> under the age of 18 years [or] under the age of 21 years who has committed an act of delinquency before reaching the age of 18 years; or [who] was adjudicated. dependent before reaching the age of 18 years and who, while engaged in a course of instruction or treatment, requests the court to retain jurisdiction until the course has been completed, but in no event shall a child remain in a course of instruction or treatment past the age of 21 years.

42 P.S.A. § 6302.

A child charged with delinquency in a juvenile court will, if adjudicated delinquent and found in need of custodial instruction or treatment, be confined in a juvenile facility. If convicted as an adult, the child will, if sentenced to incarceration, be sentenced in the same way as any adult person convicted in criminal court.[7]

A person ordered incarcerated by a Pennsylvania criminal court may be sent to either a county or state correctional institution, depending on the length of sentence. A person sentenced to a maximum

---

7. A juvenile court *may* transfer a proceeding concerning a child who "was 14 or more years of age at the time of the alleged conduct" to criminal court if the juvenile court determines, following consideration of several statutorily mandated factors, that the public interest is served by the transfer. 42 P.S.A. § 6355(a)(4) (requiring a transferring court to have found existence of a prima facie case; that the "act would be considered a felony if committed by an adult"; "that there are reasonable grounds to believe that the public interest is served by the transfer" (a category further delineated); and "that there are reasonable grounds to believe that the child is not committable to an institution for the mentally retarded or mentally ill").

In addition, a juvenile court *must* transfer a proceeding concerning a child who "was 14 or more years of age at the time of the alleged conduct" to criminal court if the child is accused of murder "or any of the offenses excluded from paragraph 2(ii) or (iii) of the definition of '*delinquent act*' in section 6302 (relating to definitions)." 42 P.S.A. § 6355(e) (emphasis in original). Paragraph 2(ii) of 42

P.S.A. § 6302 excludes from the definition of 'delinquent act' "[a]ny of the following prohibited conduct where the child was 15 years of age or older at the time of the alleged conduct and a deadly weapon ... was used during the commission of the offense, which, if committed by an adult, would be classified as" rape; involuntary deviate sexual intercourse; aggravated assault; robbery; robbery of motor vehicle; aggravated indecent assault; kidnapping; voluntary manslaughter; and an attempt, conspiracy or solicitation to commit murder or any of the foregoing crimes. Paragraph 2(iii) of 42 P.S.A. § 6302 excludes from the definition of 'delinquent acts' "[a]ny of the following prohibited conduct where the child was 15 years of age or older at the time of the alleged conduct and has been previously adjudicated delinquent of any of the following prohibited conduct which, if committed by an adult, would be classified as" rape; involuntary deviate sexual intercourse; robbery; robbery of motor vehicle; aggravated indecent assault; kidnapping; voluntary manslaughter; and an attempt, conspiracy or solicitation to· commit murder or any of the foregoing crimes.

term of less than two years must serve his sentence in a county correctional institution within the jurisdiction of the court. 42 P.S.A. § 9762(3). A person sentenced to a maximum term of five years or more must serve his sentence in a state correctional facility. 42 P.S.A. § 9762(1). A person sentenced to a maximum term of between two and five years may be committed to either a state correctional institution or a county correctional institution. 42 P.S.A. § 9762(2). "[T]he decision whether to place prisoners sentenced to a maximum period of two (2) years or more but less than five (5) years in a county facility or . . . in a state facility, 'is within the sound discretion of the trial judge.'" *Commonwealth v. Stalnaker*, 376 Pa.Super. 181, 545 A.2d 886, 888 (1988) (*quoting County of Allegheny v. Commonwealth*, 507 Pa. 360, 490 A.2d 402, 412 (1985)).

### B.

Under Pennsylvania law, persons who have reached their sixth birthday but have neither reached their twenty-first birthday nor graduated from high school are entitled to a free education. 24 P.S.A. § 5–501; 24 P.S.A. § 13–1301. Persons who have reached their eighth birthday but have neither reached their seventeenth birthday nor graduated from high school are required to attend school. 24 P.S.A. §§ 13–1326, 13–1327. At the high school level, school districts are required to provide 27.5 hours of instruction a week and 180 days of instruction per year. 24 P.S.A. § 15–1504.

There are several exceptions to these general rules. School districts are not required to provide the weekly 27.5 hours of education to students who have been expelled, who are homebound, or who are incarcerated, pursuant to conviction, in a county correctional institution. "Students who are less than 17 years of age are still subject to the compulsory school attendance law even though expelled, and they must be provided an education." 22 Pa. Code § 12.6(e). "[T]he student's school district has the responsibility to make some provision for the child's education." 22 Pa.Code § 12.6(h). The term "some provision" has been construed to mean that "local school officials [may] determine the amount and type of alternate instruction necessary and appropriate in each case." *Abremski v. Southeastern Sch. Dist. Bd. of Directors*, 54 Pa.Cmwlth. 292, 421 A.2d 485, 488 (1980) (finding one weekly ninety-minute in-school session as augment to home-study plan adequate for expelled student under age seventeen). There does not appear to be any educational entitlement for expelled students who have reached their seventeenth birthday. Homebound students engaged in a home study program commonly receive no more than five hours of instruction per week. *See* 22 Pa.Code § 11.25(b)–(c); 11/24/97 Stipulated Facts ¶¶ 91, 93.

The statute challenged in this case—24 P.S.A. § 13–1306.2(a)—limits the schooling provided to school-aged persons incarcerated, pursuant to conviction, in county correctional facilities to the quantum of education provided throughout the Commonwealth to "expelled students."[8] As

---

8. The statute's impact has been somewhat modified by Secretary Hickok's agreement with plaintiffs that school-aged inmates eligible for special education should not have their schooling curtailed. School-aged persons incarcerated (pre-trial or post-conviction) in county institutions who have special educational needs are generally entitled to a free appropriate public education pursuant to an individualized education program under the Individuals with Disabilities Education Act ["IDEA"], 20 U.S.C. § 1400 *et seq.* In the Interim Agreement Between Plaintiffs and

Defendants Eugene Hickok and Pennsylvania Department of Education (11/10/97) ["Interim Agreement"], the Commonwealth defendants agreed to fulfill their obligations under the Individuals with Disabilities in Education Act, 14 U.S.C. § 1400 *et seq.*, notwithstanding the language of 24 P.S.A. § 13–1306.2, which does not differentiate between students who are entitled to special education and those who are not. *See* Pennsylvania Department of Education, Basic Education Circular—Education Services for Students Incarcerated in

described above, "expelled" students who are sixteen or younger are entitled to have "some provision" made for their education; those who are seventeen to twenty do not appear to be entitled to any education. While as little as ninety minutes a week · of in-school education has been deemed sufficiently augmentative of a home-based plan to constitute "some provision," *see Abremski*, 421 A.2d at 488, school districts routinely apply "for payment of up to five hours of instruction per week for each student receiving homebound instruction," 11/24/97 Stipulated Facts ¶ 93; "[h]omebound instruction is also provided by school districts when a student is expelled from school," 11/24/97 Stipulated Facts ¶ 94.[9] On these facts, it appears to be a fair inference that, by virtue of § 13–1306.2(a), persons who are sixteen or younger and are incarcerated pursuant to conviction· in county correctional institutions are likely to receive as much as, but almost assuredly no more than, five hours of instruction per week.

By contrast, school-aged persons who have been convicted of a crime and are incarcerated in state correctional institutions are provided full-time schooling, which consists of five and a half hours of daily instruction year-round. 11/24/97 Stipulated Facts ¶ 49. School-aged persons in juvenile facilities are provided five and a half hours a day of instruction for 180 days a year. 11/24/97 Stipulated Facts ¶ 62. The Secretary has acknowledged that the Individuals with Disabilities Education Act ["IDEA"], 20 U.S.C. § 1400 *et seq.*, entitles school-aged persons who have *special* educational needs—whether or not incarcerated in county institutions—to a free appropriate public education pursuant to an individualized education program under the IDEA. *See* Interim Agreement; *see also* Pennsylvania Department of Education, Basic Education Circular—Education Services for Students Incarcerated in Local Correction Institutions § II (Jan. 15, 1998).[10]

The amount of *basic* educational services provided to a school-aged person who has been charged with or convicted of a crime therefore depends upon: 1) whether the person is adjudicated as a delinquent juvenile or convicted as an adult; 2) whether the person is assigned to a county or state correctional institution; and 3) the person's age. In sum, local school districts may withhold all or nearly all basic educational services from convicted school-aged persons who are incarcerated in county correctional institutions; but basic educational services may not be withheld from (a) convicted school-aged persons incarcerated in state correctional institutions, (b) juvenile delinquents housed in state · or county juvenile facilities, or (c) pretrial detainees incarcerated in any sort of correctional facility.[11]

## II. Presence of a Justiciable Case or Controversy

■ Secretary Hickok argues that there is no case or controversy between him and the plaintiff class. Commonwealth Def. Post–Trial Br. at 27. For support, the Secretary points to *1st Westco Corp. v. School Dist. of Philadelphia*, 6 F.3d 108 (3d Cir.1993). *1st Westco* was a law suit

---

Local Correction Institutions § II (Jan. 15, 1998).

9. ·24 P.S.A. § 13–1306.2(b) establishes that pre-trial detainees in county facilities are eligible for educational services in the same manner as disruptive students. "Alternative education programs for disruptive youth may operate outside the normal school day" and may alter the day or hour requirements of the Public School Code; all such alternative education programs must nevertheless "permit students to make normal academic progress and achieve requirements for graduation...." *See* Pennsylvania Department of Education, Basic Education Circular—Education Services for Students Incarcerated in Local Correction Institutions § I.A. (Jan. 15, 1998). The educational entitlement of pre-trial detainees is not contested at this time. *See* Interim Agreement.

10. *See supra* note 8.

11. *See supra* note 9.

precipitated by a decision of the Philadelphia School District that a contractor's use of out-of-state employees on school projects violated a section of the Pennsylvania Public School Code. The contractor sued the School District, claiming that the statute relied on by the School District was constitutionally infirm, and the School District then filed a third-party complaint against two high-ranking Commonwealth officials: the Secretary of Education and the Attorney General. In the third-party complaint, the School District asserted that it had—some years before—asked the Secretary whether the statute was constitutional. The Secretary had asked the Attorney General whether the statute was constitutional, and the Attorney General had informed the Secretary that the statute was constitutional and that the Secretary was bound to enforce it. On appeal, the Third Circuit held that there was no case or controversy between the School District on the one hand and the Secretary and the Attorney General on the other. With respect to the Secretary the court found that, although the Secretary was charged—as head of the Department of Education—with the duty of enforcing the statute in every other school district in the state, he had no such duty with respect to the Philadelphia School District; this was because "the state legislature, for reasons best known to them, limited this authority to review and approve specifications to second, third, and fourth class school districts and excluded Pennsylvania's first class school district. 24 Pa.Stat.Ann. § 7–731. Philadelphia is Pennsylvania's only first class school district. *Id.* at § 2–202. Thus the Secretary has no statutory power to enforce section 754 against the School District." *Id.* at 113. The Attorney General was found to be even remoter from the fray.[12]

This case is different in two salient respects. First, the Secretary is not a third-party defendant haled into court by a school district alleging it relied on a constitutional opinion rendered years earlier. Secretary Hickok is a named defendant whose issuance of a Basic Educational Circular[13] outlining local school districts' responsibilities under § 13–1306.2(a) was disseminated promptly after the statute was passed. Second, the Pennsylvania General Statutes charge the Secretary of Education with "administer[ing] all of the laws of this Commonwealth with regard to the establishment, maintenance, and conduct of the public schools...." 71 P.S.A. § 352(a). To carry out his duties, the Secretary has been delegated substantial enforcement authority; he may, for example, "prescrib[e] penalties" for violations of the school laws. *Id.; see also* 11/24/97 Tr. at 38. Moreover, Secretary Hickok is authorized to "prescribe, alter and amend basic criteria" of the Commonwealth's statewide educational plan, and is specifically required to ensure that those criteria are in accord with "all applicable laws and regulations of the Federal government." 71 P.S.A. § 366. Unlike *1st Westco*—where the Secretary's general power to penalize a school district for failure to follow contracting rules did not extend to the Philadelphia School District—this case involves a Secretary whose general power to "prescrib[e] penalties" against those school districts that fail to abide by the law extends to the school districts whose actions are at issue. *See* 71 P.S.A. § 352(a). Secretary Hickok is thus a proper defendant.

III.   The Preliminary Injunction Motion

   A.   Standard for Issuance of
        a Preliminary Injunction

■   The Third Circuit has stated:

---

12.   The court held that there was no case or controversy between the School District and the Attorney General for the reason that the Attorney General did not have a "duty to enforce" the challenged statute: he was merely "bound to issue opinions to the heads of state agencies"—a category within which the School District did not fall. 6 F.3d at 113.

13.   Basic Education Circulars are Department of Education policy statements intended to provide statewide guidance on a particular topic to local school districts.

Four factors govern a district court's decision whether to issue a preliminary injunction: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest.

*American Civil Liberties Union of New Jersey v. Black Horse Pike Regional Bd. of Educ.*, 84 F.3d 1471, 1477 n. 2 (3d Cir.1996) (*en banc*). *See also Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir.1999). "A district court should endeavor to balance these four factors to determine if an injunction should issue." *Allegheny Energy*, 171 F.3d at 158 (*citing American Civil Liberties Union of New Jersey*, 84 F.3d at 1477 n. 2.).

### B. Likelihood of Success on the Merits

#### 1. Standards of Scrutiny

"[N]or [shall any State] deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The equal protection clause "embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly." *Vacco v. Quill*, 521 U.S. 793, 799, 117 S.Ct. 2293, 2297, 138 L.Ed.2d 834 (1997) (*citing Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)). This case requires consideration of the justifications advanced by the defendants (chiefly, Secretary Hickok) for Pennsylvania's unlike treatment of two categories of persons said by the plaintiffs to be alike: school-aged inmates of county correctional institutions and school-aged inmates of other correctional institutions.

Most laws make classifications, but not all classifications violate the equal protection clause. As the Supreme Court explained in *Personnel Administrator of Mass. v. Feeney*, the "Fourteenth Amendment's promise that no person shall be denied the equal protection of the laws must co-exist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." 442 U.S. 256, 271–272, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). The Court has thus "attempted to reconcile the principle with the reality by stating that, if a law neither burdens a fundamental right nor targets a suspect class," a legislative classification will be upheld "so long as it bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). This verbal formulation characterizes the "rational basis" test. *See also Tolchin v. Supreme Court of New Jersey*, 111 F.3d 1099, 1113 (3d Cir.1997) (under "rational basis review . . . a law need only be rationally related to a legitimate state interest.").

■ Classifications that do burden a fundamental right or target a suspect class are subjected to strict scrutiny. *Clark v. Jeter*, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988). Suspect classes include race, *McLaughlin v. Florida*, 379 U.S. 184, 191–92, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964), national origin, *Oyama v. California*, 332 U.S. 633, 644–46, 68 S.Ct. 269, 92 L.Ed. 249 (1948), and alienage, *Graham v. Richardson*, 403 U.S. 365, 372, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). "Fundamental" rights include some rights, such as freedom of religion, speech and the press, specified in the Bill of Rights, and certain others, such as voting, not specified in the Bill of Rights. *See, e.g., Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 672, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); *see also Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). To survive strict scrutiny, classifications burdening a fundamental right or targeting a suspect class must be "suitably tailored to serve a compelling state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). *Accord Plyler v. Doe*, 457 U.S. 202, 217, 102 S.Ct. 2382, 72

L.Ed.2d 786 (1982) (describing test as "precisely tailored to serve a compelling government interest").

■ While the strict scrutiny and rational basis tests describe the poles of the Court's equal protection clause jurisprudence, there is also a middle ground variously described as "heightened" or "intermediate" scrutiny. *See Clark*, 486 U.S. at 461, 108 S.Ct. 1910 ("Between these extremes of rational basis review and strict scrutiny lies a level of intermediate scrutiny...."). The Supreme Court has applied this middle-ground analysis to classifications based on "sensitive" characteristics such as gender, *see, e.g., United States v. Virginia*, 518 U.S. 515, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) and illegitimacy, *see,*

*e.g. Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 175, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972). To survive "heightened" or "intermediate" scrutiny,

> the party seeking to uphold a statute ... must carry the burden of showing an exceedingly persuasive justification for the classification. The burden is met only by showing at least that the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.

*Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982) (internal citations and footnote omitted).[14]

14. The Court has itself had occasion to question whether the three-tier structure accurately describes the decisional process. *See United States Railroad Retirement Board v. Fritz*, 449 U.S. 166, 176–77 n. 10, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980) (describing eleven cases in which the Court applied rational basis test and concluding that Court had not "applied a uniform or consistent test under equal protection principles."). Individual justices writing separately have echoed the full Court's questions, occasionally proposing a different analytical framework while doing so. *See, e.g., Cleburne*, 473 U.S. at 451, 105 S.Ct. 3249 (Stevens, J., concurring, joined by Burger, C.J.) ("I have never been persuaded that [the three-tier scrutiny structure] adequately explain[s] the decisional process."); *Craig v. Boren*, 429 U.S. 190, 220–221, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (Rehnquist, J., dissenting) ("How is this Court to divine what objectives are important? How is it to determine whether a particular law is 'substantially' related to the achievement of such objective, rather than related in some other way to its achievement? Both of the phrases used are so diaphanous and elastic...."); *San Antonio Ind. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 98, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (Marshall, J., dissenting, joined by Douglas, J.) (criticizing "the Court's rigidified approach to equal protection analysis"). Some commentators, seeing the three-tier framework as more rigid than elastic, at least as applied, have argued that the choice of the standard of scrutiny is more important than the subsequent analysis, since the scrutiny standard is likely to determine outcome. *Fullilove v. Klutznick*, 448 U.S. 448, 507, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (Powell, J., concurring) (noting that

some commentators "wonder whether our review of racial classifications has been strict in theory, but fatal in fact." (*citing* Gunther, The Supreme Court, 1971 Term—Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for Newer Equal Protection, 86 Harv.L.Rev. 1, 8 (1972))).

The three-tier structure nevertheless remains intact, if not as rigid as some of its detractors have suggested. The Court has expressly disavowed any intimation that the choice of the scrutiny standard somehow determines the outcome of the scrutiny. "[W]e wish to dispel the notion that strict scrutiny is strict in theory, but fatal in fact." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). Likewise, the Court has shown that the application of rational basis scrutiny does not invariably lead to the conclusion that a challenged statute has not violated the equal protection clause. *See Hooper v. Bernalillo Cty. Assessor*, 472 U.S. 612, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985) (property tax benefit for Vietnam veterans); *Zobel v. Williams*, 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982) (statutory dividend plan favoring long-time state residents); *Cleburne*, 473 U.S. at 435, 448, 105 S.Ct. 3249 (zoning restriction on group homes for mentally disabled persons); *see also id.* at 451, 452, 455, 105 S.Ct. 3249 (Stevens, J., concurring, joined by Burger, C.J.). *Cf. Attorney Gen'l of New York v. Soto–Lopez*, 476 U.S. 898, 912, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986) (Burger, C.J., concurring) (civil service preference for Vietnam veterans); *id.* at 916, 106 S.Ct. 2317 (White, J., concurring). While selecting the appropriate standard of scrutiny sets the

## 2. Standard of Scrutiny in Education Cases

The Supreme Court has wrestled with the appropriate standard of scrutiny in four cases in which plaintiffs who were not members of a suspect class alleged denial of education or denial of access to education. As the Court itself has stated, it "has not yet definitively settled the questions whether a minimally adequate education is a fundamental right and whether a statute alleged to discriminatorily infringe that right should be accorded heightened equal protection review." *Papasan v. Allain*, 478 U.S. 265, 285, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). Because those four cases—*San Antonio Ind. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), *Papasan*, and *Kadrmas v. Dickinson Pub. Schools*, 487 U.S. 450, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988)—play such an important part in the choice of the appropriate scrutiny standard, I analyze them in some detail.

*Rodriguez* was the first such case. In *Rodriguez*, a class of Mexican American students challenged that part of the Texas public school financing system that relied on local property taxes. The plaintiff students claimed that, because they lived in poorer school districts, their schools received less educational funding and hence they received less education. Seeking to convince the Court to analyze the funding disparities under strict scrutiny, plaintiffs claimed that a fundamental right to education was implicit in the Constitution. Over the dissent of four Justices, the Court, speaking through Justice Powell, rejected the plaintiffs' claim. While not disputing plaintiffs' contention that education was a necessary prerequisite to the manifestly fundamental rights of speech and voting, Justice Powell observed that "we have never presumed to possess either the ability or the authority to guarantee to the citizenry the most *effective* speech or the most *informed* electoral choice." 411 U.S. at 36, 93 S.Ct. 1278 (emphasis in original). The Court acknowledged that it was not determining whether "some identifiable quantum of education is a constitutionally protected prerequisite to the meaningful exercise" of either the right to speech or vote, and went on to say:

> Whatever merit appellees' argument might have if a State's financing system occasioned an absolute denial of educational opportunities to any of its children, that argument provides no basis for finding an interference with fundamental rights where only relative differences in spending levels are involved and where—as is true in the present case—no charge fairly could be made that the system fails to provide each child with an opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process.

*Id.* at 37, 93 S.Ct. 1278.

In *Plyler*, the Court again had the opportunity to address the issue left open by *Rodriguez*—whether a state "financing system [that] occasioned an absolute denial of educational opportunities to any of its children" could be constitutional. *Plyler* was initiated by a class of undocumented alien children challenging a Texas statutory system that authorized local school districts to deny free enrollment to undocumented alien children and withheld state funds for the education of such children. Though *Rodriguez* had held open the possibility of finding a fundamental right in such a context, the *Plyler* Court chose not to consider whether such a right existed. Instead, the Court applied a standard of review less demanding than strict scrutiny but more demanding than rational basis scrutiny. The *Plyler* standard of review—which has subsequently been variously

starting positions for the contest, it is the scrutiny itself—a scrutiny that looks hard at

the facts—which determines the victor.

termed "intermediate scrutiny" and "heightened scrutiny"—was defined by the *Plyler* Court as requiring a determination of whether "the classification reflects a reasoned judgment consistent with the ideal of equal protection by inquiring whether it may fairly be viewed as furthering a substantial interest of the State." 457 U.S. at 217–18, 102 S.Ct. 2382.[15]

Several factors suggested to the *Plyler* Court that scrutiny more demanding than rational basis was appropriate in the context of a denial of education. First, the Court, while acknowledging that a state might be able to "withhold its beneficence" from undocumented aliens, saw no rational justification for withholding education from the children of undocumented aliens, who (unlike their parents) had no power over their disabling status. Vis-à-vis their similarly situated peers receiving free education in the Texas public schools, the undocumented alien children were innocent. Second, the Court stressed "the importance of education in maintaining our basic institutions." 457 U.S. at 221, 102 S.Ct. 2382. Third, the Court weighed the significance of "the lasting impact" of an educational deprivation "on the life of the child." 457 U.S. at 221, 102 S.Ct. 2382. Considering the second and third concerns in tandem, the Court noted that education was not "merely some governmental 'benefit' indistinguishable from other forms of social welfare legislation." *Id.* A legislature's choice to deprive "the children of any disfavored group of an education . . . [forecloses] the means by which that group might raise the level of esteem in which it is held by the majority." *Id.* at 222, 102 S.Ct. 2382. Because the Texas statutory system imposed "a lifetime hardship ["the stigma of illiteracy"] on a discrete class of children not accountable for their disabling status," heightened scrutiny was appropriate. *Id.* at 223, 102 S.Ct. 2382.

In determining the rationality of [the Texas statute], we may appropriately take into account its costs to the Nation and to the innocent children who are its victims. In light of these countervailing costs, the discrimination contained in [the Texas statute] can hardly be considered rational unless it furthers some substantial goal of the State.

*Id.* at 223–24, 102 S.Ct. 2382. Over a four-Justice dissent, the Court analyzed the statute under that standard and found it wanting. *Id.* at 227–30, 102 S.Ct. 2382.

Shortly thereafter, in *Papasan v. Allain,* 478 U.S. 265, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986), a class of Mississippi schoolchildren and local school officials from more modestly funded districts sought to end funding disparities caused by the state's distribution of land trust funds. Plaintiffs alleged that the funding disparities denied them the minimally adequate education provided to children in other areas of the state, and argued that the state had infringed a fundamental right to a minimally adequate education. *Id.* at 284–85, 106 S.Ct. 2932. The Court noted that *Plyler* had not "foreclose[d] the possibility that some identifiable quantum of education is a constitutionally protected prerequisite to the meaningful exercise of either the right to speak or the right to vote." *Id.* at 284, 106 S.Ct. 2932 (internal citations, quotation marks, and brackets omitted). Acknowledging the uncertainty without clarifying it, the *Papasan* Court stated that "this Court has not yet definitively settled the questions whether a minimally adequate education is a fundamental right and whether a statute alleged to discriminatorily infringe that right should be accorded heightened equal protection review." *Id.* at 285, 106 S.Ct. 2932. Finding, however, that the plaintiffs had not alleged any facts that supported their claim of being deprived of a minimally adequate education, the Court remanded for analysis under the

---

**15.** The standard of review described in *Plyler* appears to have been novel. *See* Laurence H. Tribe, American Constitutional Law § 16–32, at 1602–03 (2d ed.1988) (cataloguing forms of

"intermediate review" and referring to the *Plyler* formulation as "a new form of heightened scrutiny.").

rational basis test. *Id.* at 286, 106 S.Ct. 2932.

Two years later the Court considered *Kadrmas,* a case in which a student challenged the constitutionality of a North Dakota statute that allowed some school districts, but not others, to charge a fee for riding a bus to school. Though Kadrmas argued that the statutory structure denied her access to a minimally adequate education, the Court noted that she had arranged other transportation and continued attending public school even after she was prevented from using the bus. Because the plaintiff was actually attending school, the Court found, there could not have been any denial of access to a minimally adequate education; indeed, plaintiff's education had not been abridged at all. 487 U.S. at 458, 108 S.Ct. 2481. The Court construed Kadrmas's claim as an argument that the equal protection clause prevented the state from permitting a school bus fee that imposes a greater burden on the poor.

In determining the relevant standard of review, the *Kadrmas* Court turned to *Plyler,* noting that it had "not extended [*Plyler*'s] holding beyond the 'unique circumstances,' [*Plyler,* 457 U.S. at 239, 102 S.Ct. 2382] (Powell, J., concurring), that provoked its 'unique confluence of theories and rationales,' [*id.* at 243, 102 S.Ct. 2382] (Burger, C.J., dissenting)." 487 U.S. at 459, 108 S.Ct. 2481. The Court then distinguished Kadrmas's claim from the class of undocumented aliens on three grounds. First, Kadrmas was not being "penalized by the government for illegal conduct by her parents." *Id.* at 459, 108 S.Ct. 2481. Second, the Court saw no "reason to suppose that this user fee will 'promot[e] the creation and perpetuation of a subclass of

illiterates within our boundaries, surely adding to the problems and costs of unemployment, welfare, and crime.' " *Id.* (*quoting Plyler,* 457 U.S. at 230, 102 S.Ct. 2382). Finally, the Court made reference to the fact that the North Dakota statute made provision for students who could not afford the school bus user fee, giving local school boards authority to "waive any fee if any pupil or his parent or guardian shall be unable to pay such fees. No pupil's rights or privileges, including the receipt of grades or diplomas, may be denied or abridged for nonpayment of fees." *Id.* at 459–60, 108 S.Ct. 2481 (citing N.D. Cent. Code § 15–43–11.2 (1981)). After describing these distinctions, the Court concluded that "[t]he case before us does not resemble *Plyler.*" *Id.* at 460, 108 S.Ct. 2481. Turning to the rational basis test, the Court found that the school bus fee's imposition of a greater burden on the poor did not deny equal protection of the law. *Id.* at 462, 108 S.Ct. 2481.

The Third Circuit has had occasion to comment on these Supreme Court precedents. In *Philadelphia Police & Fire Ass'n v. Philadelphia,* 874 F.2d 156 (3d Cir.1989), a class of plaintiffs alleged that the City of Philadelphia had violated the equal protection clause by responding to cuts in state funding for services for the mentally retarded by reducing the level of certain "soft services" (case management, family support, and early intervention) directed to retarded citizens living at home. The Third Circuit concluded that the principles announced in *Plyler* were not applicable to the issue of funding for the mentally retarded. *Id.* at 165.[16]

**16.** As the above indicates, the plaintiffs in *Philadelphia Police & Fire Ass'n* attempted to stretch the applicability of *Plyler* to a distinct (and perhaps somewhat distant) context—the allocation of funding for services for the mentally retarded. Determining that *Plyler*'s heightened scrutiny standard was not the proper standard of scrutiny to apply to legislative choices about funding for services for the mentally retarded, the *Philadelphia Police*

*& Fire Ass'n* court characterized *Plyler* as applying to "the unique circumstances of a burden on education coupled with the disadvantaging of children of aliens." The *Philadelphia Police & Fire Ass'n* court did not, of course, have occasion to determine the precise extent to which *Plyler*—interpreted by *Papasan* and *Kadrmas*—remains applicable in the education context.

### 3. Choice of Scrutiny Standard

■ Having canvassed the jurisprudence of standards of scrutiny for equal protection clause claims, both in general and in particular within the context of education, I turn to the claims made in this case. Plaintiffs do not contend that this court should subject 24 P.S.A. § 13–1306.2(a) to strict scrutiny.[17] Plaintiffs argue for the heightened scrutiny standard set forth in *Plyler;* defendants argue for the rational basis test standard. If 24 P.S.A. § 13–1306.2(a) operates in a manner sufficiently similar to the statutory scheme at issue in *Plyler,* then heightened scrutiny is appropriate; if it does not, rational basis applies. In order to determine the degree of similarity of the impact of 24 P.S.A. § 13–1306.2(a) and the impact of the Texas statutory scheme, I return to the elements central to the *Plyler* Court's invocation of heightened scrutiny in the context of a deprivation of public school instruction: a denial of education; plaintiffs' lack of power over their disabling status; the importance of the right in maintaining basic institutions; and the consequences to individuals flowing from deprivation of the right.

#### a. Does 24 P.S.A. § 13–1306.2(a) effect a denial of education?

24 P.S.A. § 13–1306.2(a) appears to have the effect of permitting local boards of education to (1) limit to five hours per week (the accepted instructional ration of homebound students) the education provided to persons under the age of seventeen who are incarcerated, pursuant to conviction, in county correctional institutions, and (2) provide no education to those school-aged persons between seventeen and twenty incarcerated, pursuant to conviction, in county correctional institutions.[18] In other institutions—state correctional institutions or juvenile facilities—persons of school age who have not reached their twenty-first birthday are generally entitled to receive 27.5 hours of instruction per week.

Persons who have passed their fourteenth birthday but have not reached their seventeenth birthday and who, pursuant to conviction, are incarcerated in county correctional facilities, receive as little as 18% of the public school instruction provided to their counterparts incarcerated in other institutions, while their older peers—persons aged seventeen to twenty incarcerated in county correctional facilities—receive none. It may be that such a deprivation threatens the "creation of an underclass of future citizens and residents," *Plyler,* 457 U.S. at 236, 239, 102 S.Ct. 2382 (Powell, J., concurring), an underclass that would impose "significant social costs," *id.* at 221, 102 S.Ct. 2382.[19] In *Rodriguez, Papasan,* and *Kadrmas,* the Court found that school funding systems or bus fees did not threaten the creation of an underclass. *See, e.g., Kadrmas,* 487 U.S. at 459, 108 S.Ct. 2481.

---

**17.** From a doctrinal perspective, such an argument would not be untenable. As *Papasan* noted, the Court "has not yet definitively settled the question[] whether a minimally adequate education is a fundamental right." 478 U.S. at 285, 106 S.Ct. 2932. However, such an argument would not, in my view, be persuasive on the facts of this case. As I note *infra* at section III.B.3.e. of this opinion, "I find that the deprivation worked by § 13–1306.2(a)—loss of education for up to five years, commencing no earlier than the fourteenth birthday—is not substantial enough to constitute a *Plyler*-like denial of education." *A fortiori,* strict scrutiny is not the proper standard in this case.

**18.** *See* text accompanying notes 8–9, *supra.*

**19.** Nothing in either *Papasan* or *Kadrmas* undercuts *Plyler*'s concerns, since in both cases plaintiffs continued to receive significant public educational benefits. The *Papasan* plaintiffs alleged educational funding disparities—not deprivation of education—and the Court specifically found that they did not allege any facts suggesting a denial of basic educational services, 478 U.S. at 286, 106 S.Ct. 2932. Similarly, Sarina Kadrmas continued to attend, during the entire course of her litigation, the precise school that she claimed the North Dakota school bus fee statute prevented her from attending, 487 U.S. at 456, 108 S.Ct. 2481.

Notably, none of the statutory systems at issue in those three cases reduced the hours of instruction of any class of citizens by so much as a single hour. In contrast, 24 P.S.A. § 13–1306.2(a)—like the Texas statute at issue in *Plyler*—deprives young persons of the great bulk of their state-created educational entitlement.

The record in this case establishes that a deprivation of this magnitude—an 82% diminution in hours of education for a person who could be as young as fourteen [20]—is likely to have serious effects on education and literacy. The majority of incarcerated individuals have a history of poor educational achievement, school failure, and low skill proficiency, a fact reflected in the disproportionate number of persons with poor literacy skills found in the criminal justice system. *See* 11/25/97 Tr. at 5–6 (expert testimony of Dr. Peter Leone); *see also* Addendum to Expert Rep. at 1; Attachment to Pl.Ex. 5 (Center on Crime, Communities and Culture, Research Brief, "Education as Crime Prevention" ["Research Br."]). Roughly 40% of young persons in detention have a learning disability. Addendum to Expert Rep. at 1; Research Br. at 3. *Cf.* 11/25/97 Tr. at 6–7, 83–88 (county, state, and juvenile detention centers have same percentage of learning disabled inmates). *Cf. also* Stipulated Facts ¶ 59. Uncontested evidence indicates that five hours of education per week is not sufficient to learn basic skills, let alone to pass a GED examination. 11/25/97 Tr. at 14–15 (expert testimony of Dr. Peter Leone); *see also* Expert Rep. at 12–13. Indeed, expert testimony suggests—without contradiction—that an educational program offering only five hours of instruction per week provides little benefit. *Id.* at 16. It appears that, upon their release from custody, many individuals limited to five hours of instruction per week during their stay in a county correctional institution will find themselves illiterate and unemployable. 11/25/97 Tr. at 9–11; Expert Rep. at 13–15.

Nevertheless, on the preliminary injunction record before me, I cannot conclude that 24 P.S.A. § 13–1306.2(a)'s radical abridgement of classroom hours is closer kin to *Plyler*'s total denial of instruction than to the school-funding inequalities addressed in *Rodriguez* and *Papasan* or the denial of free school-bus transport addressed in *Kadrmas*. Because Pennsylvania makes education compulsory for persons who have not yet reached their sixteenth birthday, 24 P.S.A. § 13–1326, the plaintiffs—all of whom are between the ages of fourteen and twenty—are likely to have had the opportunity to acquire many of the skills that the plaintiff children in Texas had not had an opportunity to acquire. *Contra Nancy M. v. Scanlon*, 666 F.Supp. 723 (E.D.Pa.1987) (foster children of all ages).[21] Considered over the course of the fifteen years during which a Pennsylvania resident is entitled to public education, the potential for a substantial cur-

---

**20.** A juvenile court may transfer a proceeding against a child who is at least fourteen years old to criminal court if the juvenile court determines that the public interest is served by the transfer. *See generally* 42 P.S.A. § 6355; 42 P.S.A. § 9762(3); 42 P.S.A. § 9762(1); 42 P.S.A. § 9762(2) (all discussed *supra* in text).

**21.** *Nancy M.* involved a challenge by a class of non-resident dependent foster children to the constitutionality of a section of the Pennsylvania Public School Code that permitted "a Pennsylvania school district to refuse to accommodate non-resident, dependent children who live in foster homes within the district"; the districts were otherwise required to accommodate all children within their borders. *Id.* at 724. Noting that the statute deprived foster children of the general entitlement to education, the court, citing *Plyler*, found heightened scrutiny appropriate and determined that the statute would have to be "substantially related to the achievement of important governmental objectives" to survive. *Id.* at 727 (citation omitted). The court then struck down the statute, declaring the defendants' announced objectives not significantly important and finding that the means by which defendants sought to effect those objectives were not substantially related to those objectives.

tailment of education near the end of that entitlement period does not seem to me to come close enough to *Plyler* to warrant the application of heightened scrutiny.[22]

### b. Power over Disabling Status

At first glance, the plaintiffs in this case appear to be quite unlike the *Plyler* plaintiffs: Brian B. and his class cohorts are not children innocently led to violate our laws by decision-making parents; they are young people incarcerated for the commission of intentional and serious crimes. As Secretary Hickok correctly notes, they "certainly could have avoided their disabling status by not committing the serious crimes for which they were found guilty." Commonwealth Def. Post-trial Br. at 13. That fact does not end the inquiry, however. While plaintiffs could have avoided their disabling status by forbearing from the commission of crime, the relevant comparison is not between the criminal and the innocent but between inmates of county correctional institutions and other inmates.

Pennsylvania law does not undertake to impose strict limits on judicial discretion in sentencing. 42 P.S.A. § 9721 provides "that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." In imposing sentence, the court "shall also consider any guidelines for sentencing" set forth in the Commonwealth's consolidated statutes. *Id.* The court may "impose[ ] a sentence outside the sentencing guidelines," so long as it "provide[s] a contemporaneous written statement of the reason or reasons" for departing. *Id.*

For persons within either of two classes of convicted inmates, a decision to commit a particular crime may be said to involve a measure of control over the sort of institution in which the prisoner finds himself confined. State correctional institutions house both convicted offenders sentenced to five years or more and convicted offenders sentenced to two to five years and then discretionarily assigned to state institutions. Of those sentenced to five years or more, some were convicted of a limited set of crimes that carry mandatory minimum sentences of five years or more. *See* 42 P.S.A. § 9712 (certain offenses committed with firearms), 42 P.S.A. § 9713 (certain offenses committed on public transportation), 42 P.S.A. § 9714 (repeat offenders), 42 P.S.A. § 9715 (homicide), 42 P.S.A. § 9717 (certain offenses against elderly persons), 42 P.S.A. § 9718 (certain offenses against infant persons), 42 P.S.A. § 9719 (certain offenses committed while

---

**22.** Depending on how one weighs the relative effects of educational deprivations, one of two scenarios would describe the largest possible loss of education: a person incarcerated in a county correctional institution on her fourteenth birthday, pursuant to a sentence one day shy of five years, or a person incarcerated in a county correctional institution on his sixteenth birthday, pursuant to the same sentence. The former would be entitled to five hours of education per week from her fourteenth birthday to her seventeenth birthday, and then entitled to no education from her seventeenth birthday to her release (one day shy of her nineteenth birthday); if she still wished to pursue education upon her release, the nineteen-year old could avail herself of the two years and one day remaining in her entitlement period, though unrebutted evidence suggests that a significant break in education during confinement makes it considerably less likely that she would continue her education upon release. *See* 11/25/97 Tr. at 11; Pl.Ex. # 5 at 4 (expert report of Dr. Peter Leone). The person sentenced to an almost-five year incarceration beginning on his sixteenth birthday would be entitled to five hours of education for his first year in prison, and then no education for his remaining four years; upon release, he would no longer be entitled to education since, as indicated above, Pennsylvania (like most states) does not provide public education to persons who have reached their twenty-first birthday. While Secretary Hickok correctly asserts that "those youth in county jails 17 or older lose only their entitlement to education during their time of incarceration," Commonwealth Def. Post-trial Br. at 12, the second example reveals that some school-aged persons will remain incarcerated past their twenty-first birthday.

impersonating a law enforcement officer). Because a sentencing judge must commit persons sentenced to five or more years to a state institution, *see* 42 P.S.A. § 9762, persons who commit those mandatory-minimum crimes have, at least conceptually, chosen their place of incarceration.

The same may be said of persons who have committed crimes which are punishable by mandatory maximum sentences of less than two years. Because a person sentenced to a maximum term of less than two years must serve his sentence in a county correctional institution within the jurisdiction of the court, 42 P.S.A. § 9762(3), a person committing such a crime could be regarded as knowing, or at least having reason to know, where she will serve her time—assuming she undertakes an act that can give rise to a charge of only one such crime.

Many young offenders, however, do not fall into either of those categories. For them—young persons whose crimes are not of such magnitude as to trigger a statutory mandatory minimum sentence of at least five years but are more serious than the offenses for which incarceration is capped by a statutory maximum of less than two years—it is a judge, not the convicted offender himself, who chooses the sort of facility in which the offender will be incarcerated. A sentencing judge has general discretion over the length of sentence. *See* 42 P.S.A. § 9721. Because a sentence of less than two years leads to incarceration in a county correctional institution and a sentence of five or more years leads to incarceration in a state correctional institution, *see* 42 P.S.A. § 9762(1), (3), a judge imposing either sentence determines the location of the individual's incarceration. A judge sentencing a defendant to a term of two years or more but less than five years exercises a second level of discretion, deciding—independent of the length of sentence—to which sort of institution the defendant should be sent. *See* 42 P.S.A. § 9762(2); *see also Commonwealth v. Stalnaker*, 376 Pa.Super. 181, 545

A.2d 886, 888 (1988) (decision as to facility "within the sound discretion of the trial judge").

In sum, two subsets of persons incarcerated subject to conviction—persons committing crimes with mandatory minimum sentences of at least five years, and persons committing crimes with maximum sentences of less than two years—may be said to have, in a certain sense, chosen their place of incarceration. The rest cannot be said to have chosen their place of incarceration. Those convicted inmates serving their time in county correctional institutions subject to sentences imposed for the commission of crimes punishable by at least two years have not at any time exercised power over the disabling status relevant to the educational deprivation at issue in this case: placement in a county correctional institution. *Cf. Nancy M.*, 666 F.Supp. at 723 (foster children's right to education subject to discretionary placement decision of state agency).

### c. Structural Significance of the Right

Writ large, the right at issue here—access to education—is the same as that in *Plyler.* Indeed, Secretary Hickok does not claim that "the importance of education in maintaining our basic institutions," 457 U.S. at 221, 102 S.Ct. 2382, has abated since *Plyler.* However, the structural significance of access to education may differ depending on the age group of the class denied the access. The Texas statutory scheme at issue in *Plyler* denied access to education for children of all ages—not just those fourteen and over, as § 13–1306.2(a) does. Where Justice Brennan wrote persuasively in *Plyler* of "the importance of education" in providing children with the skills necessary to the prudent exercise of fundamental rights such as voting and speech, the argument has somewhat less force when applied to persons between fourteen and twenty, who have already had many years of school.

#### d. The Cost to Individuals of Deprivation of the Right

That persons between fourteen and twenty have already had the opportunity to acquire the skills necessary to exercise rights such as voting and speech does not mean that deprivation of further educational opportunities is not seriously harmful. Indeed, on the record before me I cannot say that the cost of deprivation of education is different in kind from the cost of the deprivation of education on the plaintiff class in *Plyler*—namely, that such deprivation forecloses "the means by which [the plaintiff class] might raise the level of esteem in which it is held by the majority." 457 U.S. at 222, 102 S.Ct. 2382. The *Plyler* Court noted that an individual deprived of basic education would be handicapped "each and every day of his life," and enumerated the costs of that handicap in the stark terms of an "inestimable toll ... on the social, economic, intellectual, and psychological well-being of the individual." *Id.*

The record in this case illustrates, unhappily, the continuing vitality of the findings which underlay the Court's decision in *Plyler* a dozen years ago. As testimony at the preliminary injunction hearing revealed, persons who enter county correctional institutions deficient in basic skills and are then deprived of education while incarcerated are unlikely to become literate upon release. Pl.Ex. 5 at 13. And those who do not gain a high school diploma are anywhere from three to five times as likely to suffer poverty as their graduating peers. *Id.* at 14; *see also* Profile of the Working Poor, U.S. Dept. of Labor, Bureau of Labor Statistics (1997) (rate of poverty of workers without high school diploma three times higher than workers with high school diploma); The Forgotten Half, Wm. T. Grant Foundation, Comm'n on Work, Family, and Citizenship (1988) (young persons with basic reading and mathematics skills in bottom fifth five times more likely to suffer poverty). Moreover, they are more than five times

as likely to be forced to rely on public assistance, and more than three times as likely to be unemployed. Pl.Ex. 5 at 14; *see* The Forgotten Half, *supra; see also generally* 11/25/97 Tr. at 8–12.

#### e. Appropriate Standard

In weighing the four factors analyzed above, I conclude that a portion of the plaintiff class, vis-à-vis its similarly-situated peers in other correctional institutions, has no control over the disabling status of assignment to a county correctional institution. Moreover, I conclude that, as a general matter, deprivation of education has a severely detrimental impact on the lives of the individuals deprived. Nevertheless, I also conclude that educating persons between fourteen and twenty is not as important in maintaining the basic institutions of our society as educating younger persons. Finally, I find that the deprivation worked by § 13–1306.2(a)—loss of education for up to five years, commencing no earlier than the fourteenth birthday—is not substantial enough to constitute a *Plyler*-like denial of education. I therefore conclude that the rational basis test is the more appropriate standard for analyzing the impact of 24 P.S.A. § 13–1306.2(a) on convicted inmates of county correctional institutions.

#### 4. Analysis

■ In order to obtain a preliminary injunction, plaintiffs must demonstrate a likelihood that they will prove at trial that § 13–1306.2(a) is not rationally related to a legitimate government interest. That is a tall mountain to climb, and plaintiffs cannot quite plant their flag.

Secretary Hickok claims that providing convicted school-aged inmates of county correctional institutions with educational services equal to their peers incarcerated in state correctional institutions would prove "more difficult, more expensive and more burdensome than providing these services in a state correctional institu-

tion."[23] Commonwealth Def. Post-trial Br. at 15. Secretary Hickok traces that higher difficulty and expense to several differences between state and county correctional institutions: 1) space limitations in county correctional institutions; 2) higher per-student cost in county correctional institutions; 3) security concerns that would arise in state correctional institutions if education were discontinued; and 4) the greater need for education in state correctional institutions, independent of security concerns.

### a. Space Limitations in County Correctional Institutions

Secretary Hickok claims that the limited space available within county correctional facilities for educational programming justifies providing less (or no) education to convicted school-aged persons incarcerated in those institutions.[24] The limited space presents a problem not because there is no space in which educational services may be provided, he argues, but because county correctional institutions could be forced "either to pre-empt other programs . . . [or] make costly renovations to the jails to add rooms. . . ." Commonwealth Def. Post-trial Br. at 16–17.[25]

On average, state correctional institutions have more space dedicated to educational programming than do county correctional facilities. Pl.Ex. 9. That is not always so; several county correctional institutions have more extensive educational facilities than at least one of the state correctional institutions, 11/25/97 Tr. at 115. Of course, the fact that most state correctional institutions have more space than most county correctional institutions says nothing about whether county correctional institutions have *enough* space. Secretary Hickok points to thirteen of the seventy-three county correctional institutions, identifying the thirteen as institutions where space constraints might make the provision of basic education more difficult than it is at state correctional institutions.[26] 11/25/97 Tr. at 115–22. He argues

23. Secretary Hickok argues that convicted school-aged persons incarcerated in juvenile facilities are not similarly situated to convicted school-aged persons housed in county correctional institutions because the juvenile system and the criminal justice system have different goals. Education of school-aged youth, he says, better comports with the goals of juvenile adjudication—"to seek treatment, reformation and rehabilitation"—than it does with the goals of the criminal justice system—"to punish individuals who fail to obey the law." Commonwealth Def. Post-trial Br. at 14. I have no reason to doubt that the Commonwealth has an important interest in (1) attempting to treat those offenders whom it believes require treatment and (2) punishing those offenders whom it believes require punishment. Withholding education from those persons that the government—through judicial analysis of the factors set out in 42 P.S.A. § 6355(a)(4), *see supra* note 7—has determined need punishment rather than treatment can be said to relate not irrationally (if not persuasively) to that legitimate government interest. The ensuing analysis focuses on the more difficult question whether there is a rational, and hence constitutionally sufficient, basis for the disparity between the education offered to convicted offenders incarcerated in county and state correctional institutions.

24. At the hearing held in this matter on November 24–25, 1997, Maynard Strock, Prison Inspector for the Pennsylvania Department of Corrections, testified that Union County, Montour County, and Mifflin County correctional institutions have no areas for conducting any kind of programming. 11/25/97 Tr. at 117, 120, 121. Other counties have very limited facilities for all programs: Juniata, Huntingdon, Beaver, and Schuylkill (one small room); Indiana and Vanango (library); Adams County (gymnasium); Wayne (small room designated as minimum security); and Mercer (area outside the cell blocks). 11/25/97 Tr. at 118–22.

25. Other programs offered by county correctional institutions may include drug and alcohol counseling, mental health counseling, parole review, staff training, inmate disciplinary hearings, and indoor recreation. The same rooms are occasionally used for prisoner visitation. 11/25/97 Tr. at 115–16.

26. The three county correctional institutions located in school districts that are defendants in this case are not among the thirteen county correctional institutions identified as having insufficient space for educational programming.

that requiring the provision of basic educational services in county correctional institutions would force those institutions to curtail other programming.[27]

Plaintiffs offer several rebuttals. First, they observe that Secretary Hickok has identified only thirteen of the Commonwealth's seventy-three county correctional institutions where space constraints would be a problem; those thirteen are among the smallest of the Commonwealth's county correctional institutions. Second, they note that, even in those thirteen institutions, defendants are now bound under the terms of the Interim Agreement to provide both basic educational services to pre-trial detainees (held in the same general correctional institution population as convicted offenders) and special educational services to pre-trial detainees and convicted offenders.[28] Finally, plaintiffs argue that even if some fraction of county correctional institutions do not have sufficient resources for the provision of basic educational services at present, they could adapt to accommodate such provision, just as Commonwealth correctional institutions have adapted in the past to meet the demands of larger populations and newly articulated legal requirements.

Those rebuttals narrow Secretary Hickok's space argument down to its essential core: a contention that, of the fraction of county correctional institutions identified as presenting possible space problems, one or more of those institutions could find itself housing convicted offenders who, but for § 13–1306.2(a), would be entitled to 27.5 hours of basic education per week. In such a situation, a correctional institution pressed for space but directed by court order to disregard § 13–1306.2(a) might have to displace other programming in order to make room for a class that provides basic education. That is a thin reed to support a statute which entails so substantial a deprivation. But the rational basis test sets a low threshold, one that permits statutes to pass muster even if they are based on no more than "rational speculation unsupported by evidence or empirical data." *FCC v. Beach Communications*, 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). Secretary Hickok's justification surmounts that low obstacle.[29]

*b.  Higher Per–Student Cost in County Correctional Institutions*

Secretary Hickok argues that "[t]he state legislature could reasonably conclude that, given the considerably larger number of school age youth in the prison state

---

**27.** In support of this argument, Secretary Hickok has shown that eight of the thirteen institutions have one or more higher security rooms available for programming. *Id.* Three do not have a programming area. *Id.* at 117, 120–21. One has a minimum security room available for programming; another has an open area outside a cell block for programming. *Id.* at 121–22.

**28.** *See* Pennsylvania Department of Education, Basic Education Circular—Education Services for Students Incarcerated in Local Correction Institutions § II (Jan. 15, 1998).

**29.** The Secretary's rationale would have difficulty surviving heightened scrutiny. Though the allocation of county correctional institution programming—i.e., establishing priorities among education, substance abuse counseling, mental health counseling, parole review, staff training, inmate disciplinary

hearings, and inmates' indoor recreation—appears to be an important government interest, I cannot say that § 13–1306.2(a) is 'substantially' related to that interest. The statute says nothing about allocating county correctional institution resources, and the defendants have identified only a small percentage of county correctional institutions where it is foreseeable that providing inmates with the full complement of education provided to their state correctional institution peers could contribute to difficulties with facilities management. Moreover, § 13–1306.2(a) does not permit local school districts (or the Commonwealth itself) to withhold education from youthful offenders housed in those state correctional institutions that suffer from space shortages. The heightened scrutiny test does not require a statute to take the least restrictive possible path to its goal, but neither does it sanction indirection.

system than any county jail ... education can be achieved at a greater cost effectiveness in state correctional institutions than in county jails." Commonwealth Def. Post-trial Br. at 17–18. The Secretary's argument may be understood as an assertion that the legislature may have intended to reduce average per-pupil expenditures by not providing education to correctional facilities that house few convicted offenders, where per-pupil costs might well be higher. Secretary Hickok has not produced proof showing that the curtailment of education for school-aged convicted offenders incarcerated in county correctional institutions has actually resulted in lower per-pupil expenditures. And it seems to be the case that several county correctional institutions house more school-aged convicted offenders than do a number of state correctional institutions [30]—suggesting that in the several instances in which § 13–1306.2(a) channels educational programs to smaller school-aged populations in state correctional institutions rather than to larger school-aged populations in county correctional institutions, the statute

may be seen, perversely, as tending to raise per-pupil costs. A legislature interested in reducing per-pupil educational expenditures might do better to eliminate education in correctional institutions that house less than a designated number of students, whether those institutions are state or county correctional institutions.

Under the rational basis test, however, the Secretary need not prove that § 13–1306.2(a) is wise legislation. In rational basis scrutiny, a concern for the preservation of resources generally suffices to justify a classification. See, e.g., Heller v. Doe, 509 U.S. 312, 321, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). That is so because "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." Williamson v. Lee Optical of Oklahoma, Inc., 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955).[31] Under this standard, § 13–1306.2(a) passes muster. It is not for this court to consider whether the short-term cost-cutting that the legis-

30. The Philadelphia House of Corrections apparently houses more incarcerated persons of school age than any state correctional institution in the Commonwealth. The Delaware County Prison and York County Prison each appear to house more incarcerated persons of school age than several of the state correctional institutions. Compare Pl.Ex. 7 (analysis of sentenced county jail prisoners under age 21—1994 admissions) with Pl.Ex. 8 (adult institutions school eligible count by age as of 8/31/97).

. A precise comparison of state and county inmate populations is not possible on the record before the court, because the parties have not been able to document the number of school-aged persons in state correctional institutions in 1994 or the number of school-aged persons in county correctional institutions in 1997. However, the fact that county correctional institution data derive from pre–1995 prisoner counts and state correctional institution data derive from post–1995 prisoner counts makes it more likely that plaintiffs would be able to show at trial that there is not a substantial relationship between the deprivation of basic education in county correctional institutions and the putatively important government interest of lowering per-

pupil educational costs. That is so because Act 33, passed and signed into law in 1995, has evidently substantially broadened the catalogue of crimes for which a person under the age of twenty-one could be tried as an adult, including—for the first time—many crimes that customarily result in sentences of less than two years. See 11/24/97 Tr. at 49. Thus it would appear that the percentage of county correctional facility populations under age twenty-one has rapidly expanded.

31. Plaintiffs argue further that county correctional institutions' ability to transfer inmates to other institutions pursuant to 61 P.S.A. § 72 vitiates the rational relationship between § 13–1306.2(a) and saving money. It does not. That it may be possible for the Commonwealth to save money by transferring inmates among institutions in order to aggregate students into cost-effective classes, rather than foreclosing education to inmates in an entire class of institutions, does not mean that the equal · protection clause requires it. "[C]ourts are compelled under rational basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." Heller v. Doe, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993).

lature presumably seeks will lead to considerably greater long-term costs—in the form of increased recidivism, increased crime and law enforcement costs, and public assistance to persons ill-equipped to care for themselves, matters with respect to which plaintiffs presented persuasive and unrebutted expert testimony.[32]

### c. Security Concerns in State Correctional Institutions

Secretary Hickok also argues that the provision of education to state correctional institution inmates is responsive to security concerns. In support of this rationale, Secretary Hickok points out that inmates in state correctional institutions have received educational services in the past. To discontinue such services now, he argues, would have a deleterious effect on the orderly running of those institutions.

Without question, correctional institution security is a legitimate government interest. See Turner v. Safley, 482 U.S. 78, 84–85, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Section 13–1306.2(a) does not, however, appear to relate rationally to that important interest. Even if it is true that discontinuing educational services in state correctional institutions would erode security there—and this court has no reason to suppose it is not true—Secretary Hickok need not choose such a path in order to cure any putatively illegal inequality created by § 13–1306.2(a). Plaintiffs do not seek dismantlement of state correctional institution educational programs. Section 13–1306.2(a) thus cannot be said to be rationally related to the legitimate government interest of maintaining correctional institution security.

### d. Comparatively Greater Need for Education in State Correctional Institutions

Finally, Secretary Hickok asserts that there is a greater educational need for education for school-aged convicted offenders housed in state correctional institutions than for school-aged convicted offenders housed in county correctional institutions. According to the Secretary, the legislature could have determined that "the longer term and more stable youth population found in the state correctional system would benefit more from educational services than a much more transient population found in county jails." Commonwealth Def. Post-trial Br. at 18–19. The Secretary points out that an offender's term in a county correctional institution could be less than a school year, a situation that could not occur for a school-aged youth incarcerated in a state correctional institution.

Plaintiffs argue that this contention is undermined by the fact that pretrial detainees—who often spend even less time in county correctional institutions—are entitled to basic education. See Interim Agreement ¶ 5–6. Similarly, convicted offenders entitled to special education also receive education, regardless of length of sentence or whether the correctional facility is state or county. Id. ¶ 1–4. It would be odd, plaintiffs reason, to presume that of all groups of school-aged persons incarcerated in adult facilities—pretrial detainees in state institutions, pretrial detainees in county institutions, convicted offenders in state institutions, convicted offenders in county institutions who are entitled to special education, and convicted offenders in

---

**32.** Were heightened scrutiny the appropriate standard, matters would stand rather differently; under that analysis, "a concern for the preservation of resources standing alone can hardly justify the classification used in allocating those resources." Plyler, 457 U.S. at 227, 102 S.Ct. 2382 (citing Graham v. Richardson, 403 U.S. 365, 374–75, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971)). The question under heightened scrutiny would be whether the relationship between cost savings and the educational deprivation effected by 24 P.S.A. § 13–1306.2(a) on county correctional institution inmates but not state correctional institution inmates is 'substantial'. On the facts before me, I think it likely that plaintiffs would be able to prove that 24 P.S.A. § 13–1306.2(a) is not substantially related to the governmental interest in saving money.

county institutions who are not entitled to special education—the legislature believed that the last, and only the last, would receive little benefit from education.[33]

Pedagogical matters, such as promoting educational efficiency and efficacy, no doubt involve legitimate government interests. Plaintiffs have shown, however, that the disparity of treatment fostered by § 13–1306.2(a) may be only remotely connected to those legitimate interests. Perhaps this is why Secretary Hickok's colleague—James Keeley, acting chief of the Bureau of Correction Education of the Pennsylvania Department of Education—testified that there appears to be "no reason why the school-aged population in the county prison should be treated differently than school-aged youth in the [juvenile] system and adult state correctional system." 11/24/97 Stipulated Facts ¶ 69. *See also* 11/25/97 Tr. at 17–18 (expert testimony by Dr. Peter Leone).

Notwithstanding Keeley's testimony, the Secretary asserts a rational basis in a somewhat different form by asserting that a "school age youth incarcerated for a longer term in a state prison has a greater need for education because he is much less likely to be able to return to his former school district following incarceration." Commonwealth Def. Post-trial Br. at 19. Secretary Hickok is correct that a youth incarcerated at a county correctional institution is more likely to be eligible for education upon his release than an inmate of a state correctional institution, since convicted offenders in county facilities serve shorter sentences, on average, than those in state facilities, making it more probable that those in county facilities will be released before they are too old to receive free public education. It does not necessarily follow, however, that young persons incarcerated in county correctional institutions are more likely than their state-incarcerated peers actually to return to school following incarceration. Plaintiffs have provided credible—and unrebutted—expert testimony that a significant break in education during confinement makes it unlikely that a convicted offender will resume his education when released. 11/25/97 Tr. at 11; Pl.Ex. # 5 at 4 (expert report of Dr. Peter Leone).

Nevertheless, Keeley's statement and plaintiffs' arguments are not enough to show a probability that the statute will fail the rational basis test. Though I believe that most informed observers would not find Secretary Hickok's link between the educational disparity and the interest in educational efficiency to be persuasive, the rational basis inquiry delves neither into the actual rationality of the link between disparity and interest, *FCC v. Beach Communications Inc.*, 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993), nor into the legislature's actual belief in the rationality of the link between disparity and interest, *Nordlinger v. Hahn*, 505 U.S. 1, 15, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992); it asks only whether "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach Communications*, 508 U.S. at 313, 113 S.Ct. 2096. The Secretary has articulated a basis for the classification that, within the undemanding analytical framework to which *Beach Communications* directs us, could be thought to justify the asserted link between the disparity in

---

**33.** Insofar as the Secretary's argument may be understood to be based on a concern for a classroom uninterrupted by "transient" inmates, it appears to be without substance. Correctional education does not conform to the school calendars one is accustomed to outside prison walls. Young persons are sentenced to incarceration throughout the year, and the system of criminal justice does not deposit the newly convicted in batches at the beginning of academic semesters. Classroom teachers must adapt quickly, integrating newcomers into the classroom community as surely as they bid goodbye to the newly freed. It must be a rare inmate who finds himself incarcerated on the first day of the school year and freed on the last, and perhaps as rare a correctional institution classroom that sees no change in its student population from September to June.

education and the promotion of educational efficiency.

### e. Finding

By accepting propositions attributed (by Secretary Hickok) to the legislature as ones that they conceivably entertained—though there is no evidence that the legislature in fact acted on one or more of these grounds—I am constrained to conclude that such propositions must, under governing precedent, be described as "rational", if only by the narrowest of margins. I therefore do not find it likely that, at trial, plaintiffs will be able to prove that § 13–1306.2(a) violates the equal protection rights of convicted school-aged inmates of county correctional institutions.[34]

### C. Remaining Preliminary Injunction Factors

Because plaintiffs have not shown that they are likely to succeed on the merits, there is no need to analyze the remaining factors that a plaintiff must show in order to secure a preliminary injunction.

**34.** It is at least conceivable that § 13–1306.2(a) would be open to an as-applied challenge by virtue of its interaction with Pennsylvania's custodial assignment system, which controls the entitlement to schooling *vel non* of those in custody. As indicated above, except for those offenses which carry a legislatively mandated minimum or maximum term of incarceration, a state court judge imposing sentence in conformity with Pennsylvania law has general discretion over the length of sentence. A sentence of less than two years automatically leads to incarceration in a county correctional institution; a sentence of five or more years automatically leads to incarceration in a state correctional institution. A judge imposing a sentence that falls into either of those categories thereby determines the location of the individual's incarceration. A judge sentencing a defendant to a term of more than two years but less than five years exercises a second level of discretion. Independent of the length of sentence, she must decide to which sort of institution the defendant should be sent.

Pennsylvania judges have been advised that it is proper to take education into account when they make the second-level custodial

### IV. Conclusion

For the foregoing reasons, I have concluded that plaintiffs' constitutional challenge to 24 P.S.A. § 13–1306.2(a) is not likely to prove successful at a full trial on the merits.[35] To conclude that a statute is probably not unconstitutional is not to conclude that a statute is wise, or probably so. The statute challenged in the present case is a state statute. Our constitutional system, as Justice Brandeis so tellingly instructed us, encourages the states to experiment. Not all experiments are sensible.

The record contains considerable evidence delineating the "inestimable toll ... on the social, economic, intellectual, and psychological well-being" of individuals caused by a deprivation of education. *Plyler*, 457 U.S. at 222, 102 S.Ct. 2382. Beyond the toll on the individual plaintiffs, unrebutted testimony suggests that the statute undermines public safety and the public interest. Expert testimony reveals that the cost of inmate education is approximately one-fourth of the costs of re-arrest and reincarceration. 11/25/97 Tr. at

decision. *See Commonwealth v. Stalnaker*, 376 Pa.Super. 181, 545 A.2d 886, 890 (1988) (reviewing sentencing court's custodial decision) ("The court's decision to sentence appellant to a state institution was a carefully weighed decision in which it considered, among other permissible factors, the fact that the state system provided programs that would foster appellant's educational and vocational needs. We find that this was a proper consideration of appellant's rehabilitative needs, especially in light of the fact that appellant did not have a high school diploma or any significant vocational training."). It is unclear whether Pennsylvania judges making the first-level sentencing decision consider how the sentence will affect educational entitlements. In any event, the defendants in this case do not determine the assignment process, and therefore would, presumably, not be the proper defendants for such a challenge.

**35.** It is not, indeed, at all clear that at a full trial on the merits the parties would develop a record more complete than the substantial record established at the preliminary injunction hearing, as supplemented by the parties' extensive additional submissions.

11–12 (expert testimony of Dr. Peter Leone). As reported by Dr. Leone, plaintiffs' expert witness on prison education,[36] studies commissioned by several states have shown that rates of rearrest and reincarceration are linked to levels of prisoner literacy and prisoner education. *Id.* at 12. That may be why Dr. Leone concluded that the single most cost-effective way of lowering the crime rate "is to provide educational programs to inmates while they're locked up." *Id.* Perhaps Secretary Hickok's own colleague—Director of the Bureau of Correction Education Bill Mader—put it most succinctly when he said "if we don't want to see them come back, we have to do something to help them while they are there." Stipulated Facts ¶ 54. Because "well run educational programs have incredible stabilizing effect[s] on institutional [i.e., inmate] populations," prison education increases safety within prison walls as well—for both inmates and the public servants entrusted with their care. 11/25/97 Tr. at 12.

Every member of the plaintiff class is serving a sentence of less than five years. *See* 42 P.S.A. § 9762. The average sentence of class members is less than a year. Stipulated Facts ¶ 60. At the end of those short sentences, the plaintiffs will rejoin the community that has punished them for their misdeeds. When members of the plaintiff class left that community to begin their punishment, they were disproportionately likely to have received inadequate education, been illiterate, and to have suffered from emotional disturbances. 11/25/97 Tr. at 5–7, 83–88 (expert testimony of Dr. Peter Leone); Pl.Ex. 5 at 5; Addendum to Pl.Ex. 5 at 1; Addendum to Expert Rep. at 1; Attachment to Pl.Ex. 5 (Center on Crime, Communities and Culture, Research Brief, "Education as Crime Prevention" at 2–3); Stipulated Facts ¶ 5, ¶ 59. This statute makes it less likely that the communities will find the returnees much improved.

Intuitively, one has reason to doubt the utility of a state policy that turns away from providing education for a class of state residents, even—perhaps especially—if the class is composed of persons who appear relatively undeserving and in consequence are, for a period of time which may be lengthy, consigned by the state to custody. On the record made in this case, the testimony of plaintiffs' expert witnesses confirms intuition: the predictable social costs of not educating young persons in custody would appear to be very large. The testimony of defendants' experts tends to confirm, rather than rebut, that gloomy inference. So it appears that the Pennsylvania legislature has given its blessing to an experiment that is likely to work to the state's detriment.

It is not, however, the province of a federal court to guard states from unwisdom unless that unwisdom transcends constitutional limitations. A state law that "may be unwise, improvident, or out of harmony with a particular school of thought" is not thereby unconstitutional. *Williamson v. Lee Optical of Oklahoma, Inc.,* 348 U.S. 483, 488, 75 S.Ct. 461, 99 L.Ed. 563 (1955). In the strong words of Justice Frankfurter, "[m]uch that should be rejected as illiberal, because repressive and envenoming, may well be not unconstitutional." *Dennis v. United States,* 341 U.S. 494, 517, 556, 71 S.Ct. 857, 95 L.Ed. 1137 (1951) (Frankfurter, J., concurring).

Accordingly, the motion for a preliminary injunction barring the enforcement of 24 P.S.A. § 13–1306.2(a) is denied in an order accompanying this opinion.

---

**36.** Dr. Leone is Professor of Special Education at the University of Maryland and Director of the Center for the Study of Troubling Behavior. 11/24/97 Tr. at 67–69.